## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                         No. 0:20-cr-00035-MJD-KMM

          Plaintiff,

v.

                                     **REPORT AND**
ALONZO CARTER,                                    **RECOMMENDATION**

          Defendant.

      This matter is before the Court on Alonzo Carter's Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches and his Supplemental Motion to Suppress Any Evidence Obtained as a Result of Any Illegal Searches. [ECF Nos. 21, 31.] The Court held a hearing on the suppression motions on July 29, 2020 and the parties have submitted post-hearing briefs. [Mins. of Hr'g, ECF No. 44; Gov't's Post-Hr'g Resp., ECF No. 46; Def.'s Post-Hr'g Reply, ECF No. 47.] For the following reasons, the Court concludes that Mr. Carter's motions should be denied.

## I.      Background

      Mr. Carter is charged with possessing heroin and cocaine with the intent to distribute, unlawfully possessing a firearm as a person convicted of a felony, and possessing a firearm in furtherance of a drug-trafficking crime. The investigation in this case involved several search warrants. The validity of two of those warrants is at issue here.[1]

---

[1]     Mr. Carter seeks suppression of evidence seized pursuant to ten search warrants issued between August 20, 2019 and April 9, 2020. Counsel for the government and Mr. Carter agreed that the Court only needs to review the two warrants discussed in this

*(footnote continued on next page)*

### The Ion Swab Warrant

On August 20, 2019, Hennepin County Deputy Sheriff Neil Lovejoy applied for a search warrant "[t]o enter onto the property of **** 37th Avenue North, to complete an ion swab of the storm door and ion swab of main door handle to confirm the belief narcotic activity is being conducted at the residence." [Gov't Ex. 1 ("Ion Swab Warrant") at 1, ECF No. 40-1.] The Ion Swab Warrant does not describe what an "ion swab" is or explain exactly how it can reveal "narcotic activity."

Deputy Lovejoy's application for the Ion Swab Warrant set forth his experience as a law-enforcement officer and indicated that he was, at that time, involved in an ongoing fugitive, weapons, and narcotics investigation of Mr. Carter. [*Id.* at 1–2.] During the two-week period preceding his application, a "concerned citizen" told Deputy Lovejoy that Mr. Carter possessed a handgun, was "selling illegal narcotics," and had an active arrest warrant. [*Id.* at 2.] The concerned citizen stated that Mr. Carter was staying at a townhouse on Penn near 37th Avenue North in Minneapolis, along with his niece S.F.[2] [*Id.*]

Deputy Lovejoy followed up on the information provided by the concerned citizen. He identified Mr. Carter's true name with the help of the Hennepin Country Sheriff's Office Criminal Information Sharing and Analysis, and he confirmed that Mr. Carter had an active warrant for "1st Degree Narcotics and Flee[ing] Police." [*Id.*] Deputy Lovejoy consulted a

---

decision because, "if the two warrants fall, review of the remaining 8 warrants will be moot." [Email from Joseph Teirab to the Court (July 24, 2020 3:50:20 PM (CDT) (on file with the Court).]

[2]     The concerned citizen and the application for the Ion Swab Warrant refer to S.F. by her full name.

Minneapolis Police CAD Report and Probation and learned that Mr. Carter's listed address was "[****] 37th Avenue North in Minneapolis." [*Id.*] He also confirmed that S.F., Mr. Carter's niece, listed the same address with the Department of Vehicle Services. [*Id.*] Deputy Lovejoy checked law-enforcement databases and found past convictions for Mr. Carter for fleeing police in a motor vehicle, drug charges, and for being a fugitive. [*Id.*] He also learned that Mr. Carter was on probation through Hennepin County. [*Id.*]

In the week before he submitted the application for the Ion Swab Warrant, Deputy Lovejoy "conducted surveillance of **** 37th Avenue North .... [and] observed 'row style' townhomes that all share a common trash receptacle. Each residence has its own door with [a] storm door attached." [*Id.*] Because the area where the 37th Avenue North townhome is located is highly populated with substantial foot traffic, Deputy Lovejoy requested permission to enter the curtilage of the home unannounced and during the night to avoid being seen by the suspect and potentially compromising the investigation. [*Id.* at 2–3.]

Hennepin County Judge Martha Holton Dimick signed the Ion Swab Warrant on August 20, 2019. [*Id.* at 6.] The warrant was executed at 5:00 a.m. on August 23rd, and swabs were taken from the storm door and residence door of the 37th Avenue North townhome. [*Id.* at 7.] The swabs were positive for the presence of narcotics, as explored below.

### The Residence Warrant

On August 23, 2019, Deputy Lovejoy applied for a warrant to search the townhome itself, any detached garages associated with the residence, and any vehicles directly related to the residence present at the time the search warrant was executed. [Gov't Ex. 2 ("the Residence Warrant") at 1, (on file with the Court).] The application for the Residence

Warrant repeated much of the narrative from the Ion Swab Warrant application, including the information obtained from the concerned citizen and the details learned from various law-enforcement databases and vehicle-services records. [*Id.* at 2.]

Deputy Lovejoy then explained that he had obtained the warrant for the ion scan of the townhome's doors, which was executed within the 72-hour period before he applied for the Residence Warrant. [*Id.* at 2–3.] The samples were placed in an evidence bag and tested by the Minnesota National Guard Counterdrug Task Force. [*Id.* at 3.] The storm door handle tested positive for heroin and the main doorknob tested positive for cocaine. [*Id.*] Deputy Lovejoy stated that based on his training and experience, "suspects often store narcotics inside of their residence and vehicles for safekeeping" and will hide drugs in their homes and vehicles to "avoid detection from police." [*Id.*] Deputy Lovejoy also believed other evidence (e.g., notes, scales, packing equipment, cell phones, computers, and other electronic devices, etc.) showing that a drug-trafficking crime had been committed would be found in the townhome or nearby vehicles. [*Id.* at 3–4.]

Judge Dimick signed the Residence Warrant on August 23, 2019, authorizing an unannounced nighttime entry of the premises to search for evidence. [*Id.* at 10.] Officers executed the search warrant on August 29th, recovering a handgun and magazine, several bags and baggies of suspected narcotics, and other evidence of drug-trafficking crimes. [*Id.* at 12–14.]

## II.    Legal Standards

The Fourth Amendment requires that search warrants be based upon a showing of probable cause. U.S. Const., amend. IV. Probable cause is determined based upon the

4

"totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A judge presented with an application for a search warrant is asked to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* "Judges 'may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant.'" *United States v. Daigle*, 947 F.3d 1076, 1081 (8th Cir. 2020) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).

When a defendant seeks to invalidate a search warrant because it was issued without a showing of probable cause, the resulting review is both circumscribed and deferential. "When ... the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). A reviewing court must "ensure that the [issuing] magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238–39. An affidavit that is "wholly conclusory," such as when officers state only that they believe a search would yield evidence of criminal conduct, will not satisfy this substantial-basis standard. *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (citing *Gates*, 462 U.S. at 239, and distinguishing conclusory affidavits from the affidavit at issue). The substantial-basis standard requires the reviewing court to give "great deference" to the issuing judge's probable-cause determination. *Daigle*, 947 F.3d at 1081; *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) ("'Reasonable minds frequently may differ on the question whether a particular

affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.'") (quoting *United States v. Leon*, 468 U.S. 897, 914 (1984)).

Finally, even where a reviewing court finds that the issuing judge lacked a substantial basis for concluding that the search was supported by probable cause, in *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established an exception to the exclusionary rule where evidence is obtained by police in reliance on a search warrant. The Court reasoned that the exclusionary rule is intended to deter police misconduct, and therefore does not apply where "the police acted in objectively reasonable reliance" on a search warrant issued by a judge. *Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). Under *Leon*, evidence seized in reliance on a search warrant is not subject to suppression unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (internal quotation marks omitted). In the absence of one of these circumstances, a motion to suppress the fruits of even a flawed warrant must be denied.

### III.    Analysis

Mr. Carter contends that both the Ion Swab Warrant and the Residence Warrant lacked a sufficient showing of probable cause and were so deficient that neither could be

saved by the good-faith exception recognized in *Leon*. [*See* Def.'s First Pre-Hr'g Mem., ECF No. 37; Def.'s Second Pre-Hr'g Mem. at 2, ECF No. 43; Def.'s Post-Hr'g Reply.] Although the Court finds both warrants fall short of the ideal, for the reasons discussed below, Mr. Carter's motions to suppress should be denied.

### A.    The Ion Swab Warrant

Mr. Carter first asserts that the Ion Swab Warrant application fails to show probable cause because it only describes a conclusory tip from an anonymous concerned citizen with no history of reliability as an informant, and includes no information corroborating ongoing drug dealing activity at the townhome. He also contends that the warrant is flawed because the affidavit provides no explanation of the ion scan that Deputy Lovejoy sought permission to perform. In reviewing the Ion Swab Warrant, the Court shares some of Mr. Carter's criticisms regarding its showing of probable cause. However, in light of the required deferential standard, the question is not whether this Court would have authorized the search based on the affidavit submitted, but instead whether the issuing judge had a substantial basis to determine there was probable cause. Through that lens, the Court concludes the motion to suppress should be denied.

### 1. The Concerned Citizen and Corroboration

Mr. Carter primarily argues that the Ion Swab Warrant was not based on probable cause because Deputy Lovejoy relied on a mere tip from an anonymous informant and obtained insufficient corroboration of incriminating facts. For several reasons, this argument fails in light of the controlling case law and the totality of the circumstances set forth in Deputy Lovejoy's application.

First, the fact that the concerned citizen provided an anonymous tip and had no prior history of giving reliable information to law enforcement takes some force away from the showing of probable cause. However, though relevant to the probable-cause assessment, this reality does not necessarily mean that probable cause is lacking. *See United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause."). Though an anonymous tip, without more, is insufficient to establish probable cause, it may support the issuance of a warrant when officers are able to obtain independent corroboration of the information provided. *United States v. Neiman*, 520 F.3d 834, 839–40 (8th Cir. 2008) ("Informants without a track record of providing reliable information may be deemed reliable if their information is independently corroborated by other evidence."); *United States v. Wells*, 223 F.3d 835, 839 (8th Cir. 2000) ("An anonymous tip, however, is insufficient to support a finding of probable cause."); *United States v. Loud*, No. 17-CR-2931 (ADM/LIB), 2018 WL 3104259, at *4 (D. Minn. Mar. 21, 2018), *report and recommendation adopted*, No. CR 17-293 ADM/LIB, 2018 WL 2095606 (D. Minn. May 7, 2018) ("Thus, anonymous tips may not always be insufficient to support probable cause to issue a search warrant; where even some of the information provided by an anonymous source is corroborated by law enforcement, the anonymous tipster may be deemed sufficiently reliable that his or her information supports probable cause to issue a search warrant.") (citing *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013)).

Additionally, the concerned citizen's tip was corroborated in multiple respects by Deputy Lovejoy's subsequent investigation. First, Deputy Lovejoy was able to determine that the informant provided generally accurate information regarding Mr. Carter's address. He also confirmed the name of Mr. Carter's niece and her connection to the same residence. Though these details are not themselves incriminating, they are relevant pieces in the probable-cause analysis. *See United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) ("Even the corroboration of minor, innocent details can suffice to establish probable cause.").

The deputy also corroborated a second important aspect of the tip: the existence of an active arrest warrant. Deputy Lovejoy's records check established that Mr. Carter "has" a warrant for a first-degree drug crime and fleeing the police, as the tipster described. [Ion Swab Warrant at 2.] Moreover, given that Mr. Carter was on probation through Hennepin County at the time Deputy Lovejoy applied for the warrant, it is reasonable to infer that the active arrest warrant had been issued fairly recently; if the warrant were several months old, it would likely have been resolved as part of Mr. Carter's earlier criminal case or during his probationary period. The fact that thee concerned citizen knew of Mr. Carter's active arrest warrant—the kind of detail that is not readily known or easily discovered—suggested that the tipster had direct knowledge about Mr. Carter and provided other reliable information about him. Thus, Deputy Lovejoy's corroboration of the active-warrant information suggested that the concerned citizen had provided reliable information regarding other uncorroborated aspects of the tip, including that Mr. Carter was in possession of a handgun and engaged in the sale of illegal narcotics. *See United States v. Williams*, 10 F.3d 590, 593–94

9

(8th Cir. 1993) ("If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable.") (citing *Gates*, 462 U.S. at 233–34).

Finally, Deputy Lovejoy's knowledge of Mr. Carter's criminal history, though not enough standing alone to establish probable cause, supported the judge's decision to issue the warrant. *See United States v. Ryan*, 293 F.3d 1059, 1062 (8th Cir. 2002) (including the defendant's "history of drug convictions" as one piece of the probable-cause puzzle) (citing *United States v. Sumpter*, 669 F.2d 1215, 1222 (8th Cir. 1982) (noting that an "individual's prior criminal activities and record have a bearing on the probable cause determination"). Specifically, the fact that Mr. Carter had previously been convicted of a drug crime added weight to the tip that he was currently involved in narcotics trafficking.

The application, read as a whole, suggests that the concerned citizen's information regarding Mr. Carter's ongoing drug-related activity was reliable and the issuing judge had a substantial basis for finding probable cause.

### 2. The "Ion Scan"

Mr. Carter further argues that the Ion Swab Warrant was improperly issued because Deputy Lovejoy's application did not explain the investigative tool he sought to use and did not discuss how the "ion swab" might demonstrate the presence of narcotics. Although the lack of detail regarding the ion swab is concerning, it does not require a finding that the

issuing judge lacked a substantial basis for concluding that there was a fair probability the search would reveal evidence of criminal activity.[3]

In the application for the Ion Swab Warrant, Deputy Lovejoy seeks authorization for an "ion swab" or "ion scan" on the townhome's outer doors.[4] The application does not, however, explain what an "ion swab" or "ion scan" is or how it works. But it is reasonable to infer from the face of the warrant that Deputy Lovejoy sought to employ a technological investigative tool to detect the presence of narcotics on the surface of the outer doors. Common understandings of the words "ion" and "swab" or "scan" suggest such an inference.[5] The warrant application also indicates that the purpose of the ion scan was to "confirm the belief that narcotic activity is being conducted at the residence." [Ion Swab Warrant at 1.] The implication is that the ion scan can support or undermine a belief that

---

[3]      There is no dispute in this case that an ion scan is a search and that a warrant was required. [Gov't Pre-Hr'g Resp. at 6, ECF No. 40]; *see United States v. Charles*, 290 F. Supp. 2d 610, 614 (D.V.I. 1999) (finding police officers' warrantless swipe of residue from the doorknob of a home to conduct an ion scan analysis for the presence of marijuana was an unconstitutional "search" of the doorknob, and violated the defendant's Fourth Amendment rights).

[4]      The application uses both "ion swab" and "ion scan" to describe the search that Deputy Lovejoy sought authorization to conduct. [Ion Swab Warrant at 1, 3.]

[5]      An "ion" is an atom or molecule with a net electric charge due to the loss or gain of one or more electrons. *Ion*, Oxford English Dictionary (last visited Aug. 28, 2020), https://www.oed.com/search?searchType=dictionary&q=ion&_searchBtn=Search A "swab" is "the material collected with a swab as a specimen for microscopic study." *Swab*, Dictionary.com (last visited Aug. 28, 2020), https://www.dictionary.com/browse/swab?s=t. To "scan" is to "examine, consider, or discuss minutely." *Scan*, Oxford English Dictionary (last visited Aug. 28, 2020), https://www.oed.com/search?searchType=dictionary&q=scan&_searchBtn=Search.

drug-related conduct is occurring at the location because it is a test to reveal the presence of drugs.

This common-sense reading is consistent with the way ion scans have been described in published cases for several years. Law enforcement can detect the presence of illegal drugs by taking a "swipe" or sample from a surface and then testing that sample with an ion-scan device.[6] As far back as 2009, the Eighth Circuit discussed the use of an ion scan test to detect the presence of drugs on the exterior surface of a bag, the results of which were later used to secure a search warrant for the bag and the defendant's person. *United States v. Alvarez-Manzo*, 570 F.3d 1070, 1073–74 (8th Cir. 2009). Though other courts' descriptions of this technology are not part of the factual record in this case, their existence buttresses the reasonableness of the inference that Deputy Lovejoy was referring to a scientific means of

---

[6]    In *United States v. Williams*, 865 F.3d 1328, 1335 (11th Cir. 2017), the court described how an ion scan operates as follows:

> IonScan technology is designed to detect trace amounts of illicit materials— often amounts so small as to be imperceptible to the human eye. Samples, or "swipes," are taken of areas and objects thought to contain contraband. The samples are then run through the IonScan machine, which measures the amount of time it takes for ions from vaporized molecules to drift from one side of a tube into a collector. Because every substance has a unique, predictable drift time, the machine can identify a substance on a sample based on the amount of time it takes for the vaporized molecules to drift into the collector.

*Id.* at 1335; *see also United States v. Charles*, 290 F. Supp. 2d 610, 612–13 (D.V.I. 1999) (describing the "swipe" of a doorknob and subsequent test of a sample); *see also United States v. Hernandez-De La Rosa*, 606 F. Supp. 2d 175, 178–79 (D.P.R. 2009) (recounting expert testimony concerning the ion scan technology and common use of the ion scan machines around the world).

testing for the presence of drugs when he referred to an "ion scan" in the warrant application.

Reviewing the warrant as a whole and with the common-sense approach demanded by the case law, the issuing judge could reasonably have inferred that an ion scan is a scientific test for detecting drug residue. Indeed, given the suggestion of counsel at oral argument in this case that ion swabs are more commonly used in non-federal investigations, it is reasonable to infer that Judge Dimick, who reviewed the warrant application, was already familiar with the technology.[7]  It is noteworthy that a request to take DNA or a reference to fingerprints, for example, require no explanation of the tool at issue. When the facts set forth in a warrant application permit reasonable inferences, a reviewing court should defer to the issuing judge's finding of probable cause. *See Gates*, 462 U.S. at 240 (an issuing judge is free to draw "reasonable inferences ... from the material supplied to him by applicants for a warrant" or "refuse to draw them if he is so minded"); *United States v. Hager*, 710 F.3d 830, 836 (8th Cir. 2013) (considering the sufficiency of a warrant for the search of explicit images' metadata and, despite the absence of a "thorough explanation" of how it would aid in the prosecution of the suspect, concluding that the issuing judge "could have reasonably inferred that recovery of the [suspect] images and the metadata would aid in the [suspect's] prosecution").

---

[7]    At the hearing, the Court and counsel discussed the relative infrequency with which ion scan evidence is offered or relied upon in federal criminal cases. However, this judge's own lack of familiarity with the technology does not suggest that the issuing judge was likewise unfamiliar with it, and cannot control its review of the warrant at issue.

Mr. Carter cites *Florida v. Harris*, 568 U.S. 237 (2013), to support his contention that the Ion Swab Warrant failed to show probable cause because it did not provide the issuing judge a basis to conclude that an "ion scan" test was reliable enough to actually "confirm" Deputy Lovejoy's belief that drugs were in the residence. [Def.'s Second Pre-Hr'g Mem. at 2–4.] In *Harris*, the Supreme Court was faced with the question of when a drug-detection dog's alert to the presence of illegal drugs can provide probable cause for the warrantless search of an automobile. 568 U.S. at 240. The *Harris* Court held that in a later suppression hearing, a state need not introduce exhaustive records to establish the dog's field-test results and instead adopted a more flexible approach. The Court permitted a state to show probable cause by introducing training and certification records or other similar evidence to demonstrate that a dog's alert would make a reasonably prudent person think that a search of the car would reveal evidence of a crime. *Id.* at 246–48. Based on this holding, Mr. Carter suggests that if some showing of a dog's reliability is required in the canine-alert context, then an officer seeking a search warrant to use an "ion scan" should likewise be required to offer some facts establishing that technology's reliability.

For two reasons, *Harris* is inapposite to the question now before the Court. First, *Harris* deals with the standards applicable to a court's evaluation of whether probable cause existed to support a warrantless search. As such, *Harris* provides little guidance about how a probable-cause assessment should look through the deferential lens applicable here. Through that lens, the Court cannot be hyper-critical of the issuing judge's determination that the scientific test referenced in the affidavit would be useful in detecting the presence of drugs, nor substitute its own knowledge (or lack of knowledge) regarding the technology for

that of the judge who actually issued the warrant. And this Court has already explained that it is reasonable to conclude the issuing judge drew permissible inferences regarding the nature of the ion-scan test.

Second, *Harris*'s focus is on the *results* of a canine search and whether the dog's alert provided a reliable basis to conduct a search of an automobile. In this case, Deputy Lovejoy was seeking permission to run the ion scan test, not using the results of an ion scan to justify a further intrusion. It is, therefore, difficult to derive from *Harris* a general rule that a law-enforcement officer applying for a warrant to run a scientific test must first provide particular indicia of that test's reliability. *Harris* simply does not speak to a comparable circumstance. Therefore, Mr. Carter's complaints about the absence of information regarding the ion scan's reliability are better analyzed in the context of the warrant to search the townhome itself, which relied heavily on the results of the ion scan, rather than in the context of the require for permission to conduct the test.

### 3. *Leon* Good-Faith Exception

Even if the question whether the Ion Swab Warrant was based upon a sufficient showing of probable cause were a closer call, the Court would still find that the motion to suppress should be denied under *Leon* because law enforcement relied in good faith on the warrant when they took the samples from the townhome's outer doors.

As noted above, suppression is generally not required where officers act in objectively reasonable, good-faith reliance on a search warrant. *Leon*, 468 U.S. at 922. Mr. Carter argues that *Leon* does not save this warrant because the application was so lacking in indicia of probable cause that no reasonable officer could, in good faith, have believed in its existence.

This Court disagrees. Deputy Lovejoy's affidavit is not so lacking that an officer's belief that there was probable cause for the search would be "entirely unreasonable." Instead, as explained above, while the application did not contain overwhelming evidence that Mr. Carter was involved in illegal drug activity, it certainly passed the threshold required for a showing of probable cause.

The "entirely unreasonable" language in *Leon* is strong, making this carve-out from the good-faith exception quite difficult to satisfy. *See United States v. Carpenter*, 341 F.3d 666, 670–73 (8th Cir. 2003) (noting that the phrase "entirely unreasonable" is a "particularly strong choice of words" and rejecting the defendant's arguments that a number of "infirmities" in the affidavit made it unreasonable for the officers to rely on a warrant). Deputy Lovejoy's affidavit relays an anonymous informant's tip that Mr. Carter possessed a handgun, was selling illegal narcotics, and had an active arrest warrant. The tip also provided Mr. Carter's approximate address, identified his niece by name, and indicated they were both staying in the same townhouse. The affidavit then discussed corroboration of several individually non-incriminating details about the concerned citizen's tip alongside corroboration regarding an active arrest warrant for drugs. Finally, the affidavit provided details about Mr. Carter's criminal history, including a conviction for drug offenses. When an affidavit sets forth an informant's tip about a suspect's illegal activities, and the tip is independently corroborated by police investigation, the affidavit is generally not so lacking in indicia of probable cause that an officer's reliance on the warrant is objectively unreasonable. *See United States v. Koons*, 300 F.3d 985, 991 (8th Cir. 2002) (rejecting the defendant's argument that the officers could not reasonably rely on a search warrant and explaining that

a "bare bones affidavit is one which relies on uncorroborated tips ... or mere suspicion ... but the affidavit in this case involved a corroborated tip"). The Court simply cannot say the Ion Swab Warrant was so deficient that an officer should have realized that executing it despite the fact that a judge had signed it would violate the Fourth Amendment.

The Court also finds that it was objectively reasonable for officers to rely on the warrant despite the lack of detail regarding the ion scan test Deputy Lovejoy sought permission to perform. As explained above, the very terminology used and the circumstances described in Deputy Lovejoy's affidavit supported the reasonable inference that an "ion scan" is a scientific test used to identify the presence of drug residue. It was also reasonable for the officer to assume that the state court judge who issued the warrant understood what it meant to allow law enforcement to take a sample from the townhome's doors and subject it to an ion scan. Finding otherwise would suggest that officers should second-guess, rather than defer to, an issuing judge's probable-cause determination—an outcome that is inconsistent with the rationale supporting *Leon*'s good-faith exception. *See Leon*, 468 U.S. at 914 ("Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination.").

Under these circumstances, even if the Ion Swab Warrant were determined to be deficient in its probable-cause showing, because it was not so flawed that Detective Lovejoy's reliance on it was entirely unreasonable, the motion to suppress should be denied based on *Leon*.

17

### 4. Conclusion

This Court concludes that Deputy Lovejoy's affidavit provided a substantial basis for the issuing judge to conclude that there was probable cause. Because the affidavit showed a fair probability that the ion swab would reveal evidence of criminal activity at the townhome, Mr. Carter's motion to suppress evidence obtained through the execution of the Ion Swab Warrant should be denied. Alternatively, the Court finds that the motion should be denied based on the good-faith exception in *Leon*.

### B.    The Residence Warrant

Mr. Carter argues that the Residence Warrant was not supported by a showing of probable cause because of the lack of information in the affidavit regarding the ion test itself or the reliability of its results. [Def.'s Second Pre-Hr'g Mem. at 5–7.] Like the Ion Swab Warrant, the Residence Warrant application provides few specifics regarding the technology at issue. Though an affidavit explaining the method of the test and describing the accuracy of its results would have generated fewer concerns about the probability that contraband or other evidence of criminal activity could be found in a search of the townhome, such shortcomings do not require suppression of evidence in this case. Despite the lack of details about the ion scan, looking at the totality of the circumstances and giving deference to the issuing judge's determination, Deputy Lovejoy's affidavit provided a substantial basis for a finding of probable cause.

For one thing, as with the Ion Swab Warrant, the affidavit supporting the Residence Warrant offers an adequate basis for the issuing judge to draw a reasonable inference that an "ion scan" or "ion swab" is a scientific test used to detect the presence of illegal drugs. In

fact, such an inference is even stronger in the Residence Warrant because it describes how officers entered the property's curtilage to execute the Ion Swab Warrant and provides information about what the test revealed. The application explains that:

> Deputies put on a new pair of rubber gloves and swabbed the door handle to the storm door and residence door. Deputies then placed the sample in an evidence bag.

> Deputy Glanzer under [Deputy Lovejoy's] direction then took the ION samples to the MN National Guard Counterdrug Task Force and met with SRA Paul Nelson. SRA Paul Nelson tested the samples from the target residence. The storm door handle tested positive for Heroin and the main doorknob tested for cocaine.

Residence Warrant at 3. The issuing judge could reasonably determine from these facts and the common understanding of the terms "ion," "swab," and "test" that the officers conducted molecular examination of samples taken from the outer doors of the townhome. The issuing judge could also reasonably infer that the officers took appropriate steps to get a usable sample and to maintain the integrity of the evidence. The affidavit provided a sufficient basis for the judge to make a reasoned conclusion about the ion scan's contribution to the probable-cause showing.

Again relying on *Florida v. Harris*, Mr. Carter suggests that the probable-cause showing in the Residence Warrant was deficient due to lack of information about the ion scan's reliability. [Def.'s Second Pre-Hr'g Mem. at 5–6 (citing *Harris* and *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016)); Def.'s Post-Hr'g Reply at 6.] He argues that the information in Deputy Lovejoy's affidavit is equivalent to police attempting to demonstrate probable cause from a canine alert by merely asserting "'I had a dog with me and it told me there were drugs on the doors.'" [Def.'s Second Pre-Hr'g Mem. at 6.]

Again, the Court finds Mr. Carter's analogy to *Harris* unpersuasive. The molecular test suggested by the description in the Residence Warrant application is not a test that one would reasonably expect to vary in its efficacy as one would for a canine sniff, which depends on the training and performance of an individual drug-detection dog. The ion scan test on a sample swabbed to the door has more in common with a field-test for drugs, a positive result from which is generally considered to support a finding of probable cause without any specific showing regarding its reliability. *See Green v. Webster*, 359 Fed. App'x 249, 251 (2d Cir. 2010) ("A reasonably trustworthy field test that returns a 'positive' result for the presence of cocaine is a sufficient basis for probable cause."); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 971 (7th Cir. 2003) (finding that field tests on a suspect's trash were sufficient to establish probable cause despite arguments regarding their potential unreliability); *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (concluding that officers "clearly had probable cause" when a "field test of the white powder ... indicated the presence of cocaine"); *United States v. Wendelsdorf*, No. CR04-4111-MWB, 2005 WL 138476, at *3, *6 (N.D. Iowa June 9, 2005) (discussing a warrant application's reference to a positive field test or "N.I.K." test on a trash pull and concluding that the application was legally sufficient for the issuing judge to find probable cause for a search of the target residence).

Within this District, Magistrate Judge Becky R. Thorson has found positive results of an ion scan test from a defendant's doorknob suggestive of an ongoing drug enterprise, which contributed to a finding that there was probable cause to search the defendant's apartment. *United States v. Reed*, No. CR 17-253 (MJD/BRT), 2018 WL 4233836, at *6 (D. Minn. July 11, 2018), *report and recommendation adopted*, No. CR 17-253 (MJD/BRT), 2018 WL

20

4232999 (D. Minn. Sept. 5, 2018). Magistrate Judge Thorson rejected the defendant's

argument that "the Ion Scan does not bolster the warrant application because there is no

information as to the veracity or reliability of the Ion Scan device or its results." *Id.* 2018 WL

4233836, at*6 n.4.[8] Although here the results of the ion swab are more central to the

probable-cause showing than in *Reed*, the positive tests from the sample corroborated the

concerned citizen's tip that Mr. Carter was involved in the sale of illegal drugs. *Id.* 2018 WL

4233836, at*6 n.4 ("Moreover the government is not, as in *$10,700.00 in U.S. Currency*,

relying 'heavily' on the Ion Scan to establish probable cause.... Rather, the Ion Scan is a

single piece of evidence offered to corroborate information provided by two separate

informants.").

   Other cases discussing ion-scan analysis support the Court's conclusion that the

results from the Ion Swab Warrant's execution buttressed the probable-cause showing in the

application for the Residence Warrant. *See United States v. Alvarez-Manzo*, 570 F.3d 1070, 1073

(8th Cir. 2009) (discussing a positive ion scan for heroin on the exterior of a bag in the

context of an application for a search warrant of the bag); *United States v. $328,910.00 in U.S.*

*Currency*, No. 4:14-CV-00757-KGB, 2020 WL 1931297, at *14 (E.D. Ark. Apr. 21, 2020)

("The Eighth Circuit has noted that ion scanning can be used to confirm the presence of

---

[8]    In rejecting the defendant's unreliability argument, Judge Thorson distinguished a
Third Circuit decision, *United States v. $10,700 in U.S. Currency*, 258 F.3d 215 (3rd Cir. 2001),
which expressed doubts about the ion scan's ability to establish probable cause for forfeiture
of currency. *Reed*, 2018 WL 4233836, at*6 n.4. She noted that the Third Circuit has not
extended the reasoning of *$10,700 in U.S. Currency* "to the issue of probable cause for search
warrants." *Reed*, 2018 WL 4233836, at *6 n.4 (citing *United States v. Rivera*, 347 Fed. App'x
833, 838 (3rd Cir. 2009)).

illegal drugs in a suspicious bag.") (citing *Alvarez-Manzo*, 570 F.3d at 1073, and *Reed*, 2018 WL 4233836); *see also State v. Hunt*, No. A19-0336, 2020 WL 522167, at *3 (Minn. Ct. App. Feb. 3, 2020), review denied (Apr. 14, 2020) ("Moreover, an ion swab of appellant's door handle on December 5, 2017, tested positive for methamphetamine, after a swab from October 9, 2017 tested negative, providing additional support for the inference of ongoing criminal activity.").

Finally, Mr. Carter argues that the weight given to the ion scan results should be limited because it is common knowledge that much of the currency in circulation in the United States will test positive for the presence of drugs, making it unreasonable to draw conclusions from the fact that any person's cash is contaminated. [Def.'s Second Pre-Hr'g Mem. at 5 n.1.] Thus, he suggests that the presence of drug residue on the doors' handle and knob is a poor indicator that criminal activity was taking place within the townhome. [*See id.*] Cash and doorknobs are, quite obviously, different in several respects; primarily they differ in that doorknobs do not circulate, whereas cash potentially encounters illegal drugs as it changes hands many times. Drug residue on a doorknob, therefore, says more about what one might expect to find inside the premises than drug residue on currency tells us about whether the person holding contaminated cash at any given moment is connected to criminal activity. Mr. Carter's comparison to contaminated currency does not support suppression in this case.

For these reasons, the Court recommends that Mr. Carter's motion be denied to the extent it seeks suppression of evidence seized pursuant to the Residence Warrant.[9]

## IV.    Recommendation

Based on the discussion above, the Court makes the following recommendation:

1.    Mr. Carter's Motion To Suppress Any Evidence Obtained As A Result Of Any Illegal Searches, **ECF No. 21**, should be **DENIED**.

2.    Mr. Carter's Supplemental Motion To Suppress Any Evidence Obtained As A Result Of Any Illegal Searches, **ECF No. 31**, should be **DENIED**.

Date: September 18, 2020

 _s/ Katherine Menendez_
Katherine Menendez
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

---

[9]    As above, the Court concludes that there was a substantial basis for the issuing judge to determine there was probable cause. However, if the Court were to reach the question of the officers' good-faith reliance on the Residence Warrant, the Court would alternatively recommend that Mr. Carter's motion to suppress be denied based on *Leon*. As with the Ion Swab Warrant, an officer searching townhome in reliance on the Residence Warrant would have acted in good faith because it would be reasonable to assume that the issuing judge properly found probable cause.

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.